**Eric S. SCHAFFER and Connie R. Schaffer, Plaintiffs/Respondents,**

v.

**PROPERTY EVALUATIONS, INC., and Joseph W. Roberson, Defendants/Appellants.**

No. 62102.

Missouri Court of Appeals, Eastern District, Division One.

March 23, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 3, 1993.

Application to Transfer Denied June 29, 1993.

Robert J. Schaeffer, Schaeffer, Kruse & Piatcheck, Clayton, for defendants/appellants.

Mark M. Wenner, Clayton, for plaintiffs/respondents.

REINHARD, Judge.

Plaintiffs obtained a $15,000 judgment against defendants upon a jury verdict for breach of a home inspection contract. On appeal, defendants claim that pursuant to the written contract plaintiffs' damages were limited to the $153 inspection fee. We affirm.

The evidence reveals that on November 14, 1989, plaintiffs entered into a contract to purchase a house at 500 Willow in Kirkwood, Missouri. Their real estate agent recommended that the house be inspected and plaintiffs subsequently contacted defendant Property Evaluations, Inc.

Property Evaluations sent plaintiffs a letter which included a "standard inspection order agreement". The letter instructed plaintiffs to review the agreement and stated that it was in the process of scheduling the inspection.

The "inspection order agreement" was a one page form printed in small type. It stated that the inspection would cost $153 and provided space at the bottom of the form for signatures of "client" and "company representative". The document further provided in relevant part:

4. The Client acknowledges that this inspection and the report reflect only those conditions which could be ascertained through limited inspection and observation at the time of the inspection. Consequently, due to the complexity and the number of elements inspected in a limited time period and the fact that all value judgments are made without the benefit of exhaustive evaluation, the Company cannot represent that all present or potential deficiencies will be identified or reported on or that the inspector will be infallible in his judgments. Furthermore, neither this home inspection nor report is intended to be or relied upon as an insurance policy or guarantee, expressed or implied, against undisclosed or future defects. *The Company's liability for any Client post-inspection claims is limited to a maximum of the inspection fee paid,* unless an inspection warranty is available and has been purchased by the Client. If additional or alternative protection is desired, companies providing this type of insurance should be contacted. Should a claim or dispute arise regarding any aspects of this inspection, client will promptly notify the Company in writing and prior to any corrective or remedial action, in order to provide the company the option to assess the reported condition. Failure by the Client to properly provide this notification and access will release the Company of any and all liability concerning this inspection. (Emphasis ours).

On November 21, 1989, defendant Joseph Roberson, an employee of Property Evaluations, inspected the house. Following the inspection, Mr. Roberson prepared a report which he sent to plaintiffs. The report stated that the "[c]oncrete foundation walls [are] in overall satisfactory structural condition."

Accompanying the report was an offer for plaintiffs to purchase a "Limited Warranty" which Property Evaluations indicated would provide protection "against unexpected repair or replacement expense for a 12 month period commencing with the transfer of title to [plaintiffs]." The cost of the warranty was $153 and its terms limited recovery for structural defects to "$1,000 per occurrence". Plaintiffs did not purchase it.

In April, 1990, plaintiffs, concerned about an inordinate amount of water leakage in the basement, hired Eugene Brucker, a geotechnical engineer, to perform an inspection of the basement foundation. At trial, Mr. Brucker testified that the north and east walls of the house were moving inward. He stated that the walls would continue to move inward until they eventually failed and that the cracks in the walls would lead to flooding of the basement. He further testified that these walls should be replaced and that the cost would be approximately $10,000 for the north wall and between $10,000 and $15,000 for the east wall.

In their sole point on appeal, defendants contend that the trial court erred in refusing Instruction B which would have limited plaintiffs' recovery to $153.

We find this case similar in many respects to our case of *Weindel v. DeSoto Rural Fire Protection Assn., Inc.,* 765 S.W.2d 712 (Mo.App.1989). In *Weindel,* plaintiffs had purchased a fire tag from defendant for a $12.50 fee. *Id.* at 713. The receipt for the tag stated, in relevant part:

[Defendant] shall not be subject to suit by any individual acquiring any tag, nor by anyone seeking to recover pursuant to said tag holders claims or rights.

\*     \*     \*     \*     \*     \*

It is further agreed that neither second party, or any party claiming any rights under this document shall have the right to make any claim against [defendant] or any individuals connected in any way with it either in contract or tort or on any other basis for any damages for failure to respond, fight a fire, put out a fire, or for any damages caused by a spread of existing fire since all parties expressly agreed [defendant] is a volunteer non-profit association without sufficient paid employees and [defendant] cannot in any way guarantee the performance of any of their volunteering individuals.

*Id.* at 715.

Subsequently, a fire occurred in plaintiffs' mobile home. *Id.* at 714. Because the firefighters mistakenly believed that plaintiffs had not purchased a fire tag, they were late in responding to the fire and the mobile home was destroyed. *Id.* Plaintiffs brought a negligence action against defendant and the jury returned a $17,500 verdict. *Id.*

On appeal, defendant claimed that plaintiffs were not entitled to damages because of the exculpatory language contained in the fire tag receipt. *Id.* at 715. On this issue, we found the following:

An agreement to exempt or exonerate one from the consequences of his own negligence is not against public policy. One dealing with private interests may *bargain* for his exoneration from the consequences of his ordinary negligence in arriving at the meeting of the minds necessary to the formation of a contract. A release or covenant not to sue requires consideration. In addition, an agreement to terminate or release one from a contract is a new contract which must be supported by new consideration. In the present case, the release was not supported by new consideration, [plaintiffs] agreed to pay $12.50 in exchange for

[defendant]'s promise to perform fire-fighting services. [Plaintiffs] further agreement to release [defendant] from all contract or tort claims was not supported by new consideration by [defendant]. Finally, we note the language in *Aiple v. South Side National Bank*, 442 S.W.2d 145, 151 (Mo.App., E.D.1969), wherein it is stated, "There can be no release unless there exists at the time of the claimed release a bona fide controversy concerning [a] defendant's legal liability on some issue in dispute between the parties." At the time [plaintiffs] signed the release or covenant not to sue no such controversy existed.

*Id.* (Citations omitted).

In the present case, plaintiffs executed a form contract presented by defendant Property Evaluations. There is no indication in the record that any terms of the contract were bargained for. The form stated that Property Evaluations' liability for *any* claim was limited to the inspection fee. No separate consideration existed for this limitation and no controversy existed at the time plaintiffs executed the contract containing the exculpatory clause.[1]

Judgment affirmed.

AHRENS, P.J., and CRIST, J., concur.

---

1. We additionally direct the parties' attention to *Samson Sales, Inc. v. Honeywell, Inc.*, 12 Ohio St.3d 27, 465 N.E.2d 392 (1984). In *Samson*, the Ohio Supreme Court was confronted with an exculpatory clause in a burglar alarm contract which limited defendant's liability to the sum of $50. *Id.* 465 N.E.2d at 393. In refusing to enforce the clause, the *Samson* court used a liquidated damages analysis, concluding that "the nominal amount set forth in the contract between [plaintiff] and [defendant] ha[d] the nature and appearance of a penalty." *Id.*, 465 N.E.2d at 394.